PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

———

No. 09-3601

———

OSS NOKALVA, INC.

v.

EUROPEAN SPACE AGENCY,
                                    Appellant

———

No. 09-3640

———

OSS NOKALVA, INC.,
                                    Appellant

v.

EUROPEAN SPACE AGENCY

———

On Appeal from the United States District Court
for the District of New Jersey
(D.C. No. 3-08-cv-03169)
District Judge: Honorable Mary L. Cooper

———

Argued June 29, 2010

Before: SLOVITER, BARRY, and HARDIMAN,
Circuit Judges

(Filed: August 16, 2010)

Elliot D. Ostrove  (Argued)
Day Pitney
Morristown, N.J.  07962

Attorney for Appellant in No. 09-3601,
Appellee in No. 09-3640

Ronald L. Israel  (Argued)
Wolff & Samson
West Orange, N.J.  07052

Attorney for Appellee in No. 09-3601
Appellant in No. 09-3640

____

OPINION OF THE COURT

____

SLOVITER, *Circuit Judge*.

This case comes to us under the collateral order doctrine on appeal from the District Court's order denying the European Space Agency's ("ESA") motion to dismiss the claims of OSS Nokalva, Inc. ("OSSN").  ESA had asserted absolute immunity from suit based on its status as an international organization.  The District Court held that ESA is generally entitled to absolute immunity, but that here it waived such immunity.  ESA appeals the conclusion that it waived immunity.  OSSN cross-appeals the finding that ESA "is entitled to absolute immunity in the first place."  OSSN Br. at 2.  We agree with the District Court that ESA is not entitled to immunity in this case, but our conclusion is based on reasons other than those relied on by the District Court.

**I.**

**A.     The Parties**

OSSN is a New Jersey corporation which provides

2

software and services to its customers. ESA, a designated international organization with headquarters in Germany, is comprised of eighteen member states and was founded "to provide for and to promote, for exclusively peaceful purposes, cooperation among European States in space research and technology." ESA Convention, Art. II(a) (quotation and citation omitted).

A federal statute enacted in 1945, the International Organizations Immunities Act, 22 U.S.C. § 288, *et seq.* ("IOIA"), applies to those international organizations which the President designates as entitled to the benefits of the Act. *See* 22 U.S.C. § 288. The IOIA provides that designated international organizations, to the extent consistent with the instruments creating them, have the capacity to enter into contracts. *Id.* § 288a(a)(i). The IOIA also provides that designated organizations "enjoy the same immunity from suit and every form of judicial process as is enjoyed by foreign governments, except to the extent that such organizations may expressly waive their immunity for the purpose of any proceedings or by the terms of any contract." *Id.* § 288a(b). ESA's predecessor was designated as an international organization by President Johnson in 1966. *See* Exec. Order No. 11,318, 31 Fed. Reg. 15307 (Dec. 5, 1966), as amended by Exec. Order No. 11,351, 32 Fed. Reg. 7561 (May 22, 1967), superceded by Exec. Order No. 11,760, 39 Fed. Reg. 2343 (Jan. 17, 1974), as amended by Exec. Order No. 12,766, 56 Fed. Reg. 28463 (June 18, 1991).

The ESA Convention ("Convention") governs ESA's policies, procedures, and internal rules. A council of representatives ("Council") from ESA's member states oversees its governance. The Convention provides that ESA is immune from "jurisdiction and execution," except

> to the extent that it shall, by decision of the Council, have expressly waived such immunity in a particular case; the Council has the duty to waive this immunity in all cases where reliance upon it would impede the course of justice and it can be waived without prejudicing the interests of the Agency[.]

3

Convention, Annex I, Art. IV ¶ 1(a).

**B.  The Agreements**

ESA contracted with OSSN to provide it with, among other things, software tools and related proprietary software and information to assist ESA in developing its own software. Between 1996 and 2004, the parties executed four sets of License Agreements and corresponding Software Maintenance Agreements ("Agreements").[1]

The first set of Agreements, License No. 5941, dated February 7, 1996, provided that "[a]ny dispute which cannot be settled amicably shall be submitted to arbitration.  The arbitration proceedings shall take place in Princeton (New Jersey) in accordance with the rules of the International Chamber of Commerce."  App. at 62, 65.  A provision consenting to the jurisdiction of the New Jersey courts was struck out.  The subsequent Agreements, though, contained a different forum selection clause – language setting forth that each

> Agreement shall be governed by the laws of the state of New Jersey and [that ESA] expressly submits to jurisdiction therein . . . and agrees that any dispute arising out of this Agreement shall be subject exclusively to the jurisdiction of New Jersey courts or the Federal court for the district of New Jersey.

App. at 68, 72, 75, 79, 82, 86.  Of significance to the underlying dispute between the parties is the provision of the License Agreements that stated "[n]either the Program(s) nor this Agreement may be assigned, sublicensed or otherwise transferred by [ESA] without prior written consent from OSS[N]

---

[1]These were: (1) License Number 5941; (2) License Number 7936; (3) License Number 8117; and (4) License Number 9661, all of which provided that ESA would purchase an "individual, non-transferable and non-exclusive license to use the licensed software program(s) . . . ."  App. at 61, 67, 74, 81.

4

. . . ." App. at 61; *see also* App. at 67, 74, 81.

## C.    The Underlying Dispute

Based on its contention that ESA breached the agreements, OSSN filed suit against ESA in the Superior Court of New Jersey, Somerset County. ESA removed OSSN's action to the United States District Court for the District of New Jersey under 28 U.S.C. § 1441(a). The District Court had diversity jurisdiction under 28 U.S.C. § 1332(a).

In its complaint, OSSN asserts that ESA: (1) breached the Agreements by distributing OSSN software to third parties; and (2) failed to compensate OSSN for certain software, as well as for the distribution of OSSN's software to third parties. As a result, OSSN filed contract claims as well as claims for unjust enrichment, conversion, negligence, collection of debt payable, and a claim asserting that ESA "tortiously and unlawfully interfered with [OSSN's] customer relationships and prospective economic advantage . . . ." App. at 33-37.

ESA moved to dismiss the complaint under Federal Rule of Civil Procedure 12(b)(1), contending that the District Court lacked subject matter jurisdiction because the IOIA grants it absolute immunity. OSSN countered first that ESA's immunity is not absolute and does not bar suit in this case, and alternatively, that even if ESA's immunity is absolute, it waived such immunity both by the Convention and by ESA's execution of the Agreements with the aforementioned forum selection clauses.

## D.    The District Court Decision

The District Court denied ESA's motion to dismiss. The Court relied primarily on a decision of the United States Court of Appeals for the District of Columbia, *Atkinson v. Inter-American Development Bank*, which held that the Inter-American Development Bank, a financial institution designated as an international organization under the IOIA, was entitled to "'virtually absolute'" immunity, "contingent only upon the State

5

Department's making an immunity request to the court . . . ." 156 F.3d 1335, 1340 (D.C. Cir. 1998) (quoting *Verlinden B.V. v. Cent. Bank of Nigeria*, 461 U.S. 480, 486 (1983)). Following that reasoning, the District Court found "that ESA[, like the Inter-American Development Bank,] is entitled to absolute immunity" pursuant to the IOIA. App. at 14.

Nevertheless, the District Court continued, "[a]n international organization's absolute immunity . . . is subject to . . . limitation [by] . . . express waiver by the international organization . . . ." App. at 14 (citing *Mendaro v. World Bank*, 717 F.2d 610, 613-14 (D.C. Cir. 1983)). Focusing on the language in the Convention stating that "'the Council has the duty to waive . . . immunity in all cases where reliance upon it would impede the course of justice and it can be waived without prejudicing the interests of the Agency,'" App. at 15 (quoting Convention, Annex I, Art. IV ¶ 1(a)), the District Court denied ESA's motion to dismiss on the ground that ESA waived its immunity for "both the contract and tort claims" brought by OSSN, App. at 22. The District Court reasoned that although such non-specific waivers are disfavored, a waiver of immunity here "would provide ESA with [a] corresponding benefit[ ]." App. at 16. Such benefit, decided the District Court, is "the ability to participate in the international commercial marketplace." App. at 21. ESA appeals that decision. OSSN cross appeals the finding that ESA is entitled to absolute immunity.

## II.

Although the parties do not raise it, we must address whether we have appellate jurisdiction over the District Court's denial of ESA's motion to dismiss. Ordinarily, a denial of a motion to dismiss would not be a final decision subject to appeal. *See* 28 U.S.C. § 1291. However, "final decisions of the district courts" under § 1291 "also include a small set of prejudgment orders that are 'collateral to' the merits of an action and 'too important' to be denied immediate review." *Mohawk Indus., Inc. v. Carpenter*, 130 S. Ct. 599, 603 (2009) (quoting *Cohen v. Beneficial Indus. Loan Corp.*, 337 U.S. 541, 546

6

(1949)).

ESA, citing, among other precedents, *Mitchell v. Forsyth*, 472 U.S. 511 (1985), asserts that "[a] denial of absolute immunity is immediately appealable under the collateral order doctrine." ESA Br. at 2. OSSN does not dispute our appellate jurisdiction. Rather, it cross-appeals and "adopts the Jurisdictional Statement proffered by ESA . . . ." OSSN Br. at 1.

In *Mitchell*, the Supreme Court stated that "the denial of a substantial claim of absolute immunity is an order appealable before final judgment, for the essence of absolute immunity is its possessor's entitlement not to have to answer for his conduct in a civil damages action." 472 U.S. at 525 (citations omitted). The District Court held that ESA was ordinarily entitled to absolute immunity under the IOIA, but decided that in this case ESA was subject to the exception to absolute immunity for its "express waiver." App. at 14 (citing 22 U.S.C. § 288). Although this situation does not fall precisely within the holding of *Mitchell*, we hold that we have appellate jurisdiction under the collateral order doctrine.

"To be appealable [under the collateral order doctrine] a district court's order must 1) conclusively determine the disputed question; 2) resolve an important issue completely separate from the merits of the action; and 3) be effectively unreviewable on appeal from a final judgment." *Forsyth v. Kleindienst*, 599 F.2d 1203, 1207 (3d Cir. 1979). All three criteria are met here. The District Court's dual determinations (1) that ESA was entitled to absolute immunity under the IOIA, and (2) that it waived such immunity in this case, are each important, disputed, and separate from the underlying contract and tort claims. Finally, inasmuch as absolute immunity is the "right not to be subjected to trial," the determination that ESA waived its immunity under the IOIA resolved a right that is "effectively unreviewable" on direct appeal because even were ESA to prevail after a trial, it still would have been subject to the process. *See id.* at 1209. Having satisfied ourselves that we have appellate jurisdiction under the collateral order doctrine and 28 U.S.C. § 1291, we note that our

7

review is plenary[2] and turn to discuss the parties' disputes over waiver and the scope of immunity under the IOIA.

## III.

It is an accepted tenet of appellate jurisdiction that we "may affirm a judgment on any ground apparent from the record, even if the district court did not reach it." *See Kabakjian v. United States*, 267 F.3d 208, 213 (3d Cir. 2001) (citing *Resolution Trust Corp. v. Fidelity and Deposit Co. of Maryland*, 205 F.3d 615, 635 (3d Cir. 2000)). We cannot accept the District Court's decision that ESA is entitled to absolute immunity and therefore need not address whether ESA waived its immunity. We believe there is a more generally applicable basis on which to decide the relevant issue, and proceed therefore to discuss OSSN's cross-appeal.[3]

We begin with an analysis of the IOIA. That Act provides that international organizations such as ESA "shall enjoy the *same* immunity from suit and every form of judicial process *as is enjoyed by foreign governments* . . . ." 22 U.S.C. § 288a(b) (emphases added). As the text makes clear, "Congress was legislating in shorthand, referring to another body of law – the law governing the immunity of foreign governments – to define the scope of the new immunity for international

---

[2] *See Taliaferro v. Darby Twp. Zoning Bd.*, 458 F.3d 181, 188 (3d Cir. 2006). In an appeal from a grant or denial of a motion to dismiss for lack of subject matter jurisdiction pursuant to Rule 12(b)(1), this Court reviews only whether the allegations on the face of the complaint, taken as true, allege sufficient facts to invoke the jurisdiction of the District Court. *Id.*

[3] OSSN also argues that ESA waived its immunity by entering into three License Agreements and three Maintenance Agreements that did not cross out the provision referred to above and that expressly submitted ESA to the jurisdiction of New Jersey courts. ESA argues that this was done mistakenly. We need not decide this issue in view of our decision explained below.

organizations." *Atkinson*, 156 F.3d at 1340. The effect of "legislating in shorthand" was to link the immunity of international organizations to that of foreign governments. As a "reference statute," it raised whether the IOIA should be understood to codify for international organizations the extent of immunity that foreign governments enjoyed in 1945 when the IOIA was enacted, or whether it should be understood to require incorporation of subsequent changes in the law of foreign sovereign immunity. *See id.* The D.C. Circuit in *Atkinson*, and the District Court in reliance thereon, took the former view, determining that the IOIA provided that international organizations were to have indefinitely the same level of "virtually absolute" immunity as foreign sovereigns enjoyed in 1945 – later changes to foreign sovereign immunity notwithstanding. *Id.* at 1340 (quoting *Verlinden*, 461 U.S. at 486).

Even if the *Atkinson* court were correct that foreign sovereigns always enjoyed absolute immunity in 1945, and we recognize that there may be some question about that proposition,[4] it does not follow that subsequent changes to the extent of immunity accorded to foreign sovereigns should not be reflected in the immunity to which international organizations are entitled under the IOIA. The language of the IOIA suggests the contrary.

---

[4]As OSSN points out, the notion that foreign governments necessarily enjoyed absolute immunity in 1945 is contravened by considerable evidence. *See Verlinden*, 461 U.S. at 486 (explaining that by 1943 the Supreme Court "deferred to the decisions of the . . . Executive Branch . . . on whether to take jurisdiction over actions against foreign sovereigns . . . ."). We need not speak to this issue because, for the reasons set forth, the immunity foreign sovereigns enjoyed in 1945 is irrelevant to the appropriate level of immunity due international organizations today. However, the fact that immunity for foreign sovereigns was determined on a case-by-case basis in 1945 bolsters our conclusion that Congress intended the IOIA's "same immunity" language to reflect changes to foreign sovereign immunity as they occurred.

9

The most important change to the immunity of foreign sovereigns occurring since 1945 was the enactment of the Foreign Sovereign Immunity Act of 1976 ("FSIA"). *See* 28 U.S.C. §§ 1330, 1602, *et seq.* That Act affords foreign governments immunity from the jurisdiction of United States courts, *see id.* § 1604, except in specific circumstances, including those:

> (1) in which the foreign state has waived its immunity either explicitly or by implication . . . ; [and] (2) in which the action *is based upon a commercial activity carried on in the United States by the foreign state; or upon an act performed in the United States in connection with a commercial activity of the foreign state elsewhere*; or upon an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States[.]

*Id.* § 1605(a)(1)-(2) (emphasis added).

In its cross appeal, OSSN asserts that "the IOIA confers the same immunity . . . on international organizations as foreign governments receive under U.S. law, which is the restrictive immunity now codified in the FSIA." OSSN Br. at 41. Well-established rules of statutory interpretation demonstrate why we are persuaded that this is so.

As a general rule, courts look to the language of the text to determine statutory meaning. Assuming without deciding that the meaning of § 288a of the IOIA is unclear, we look to "certain interpretative rules" that "function as helpful guides in construing ambiguous statutory provisions." *Ali v. Fed. Bureau of Prisons*, 552 U.S. 214, 228-29 (2008) (Kennedy, J., dissenting).

Acknowledging that the IOIA is a "reference statute," the *Atkinson* court noted the potential relevance of the well-established canon of statutory interpretation that "[a] statute which refers to a subject generally adopts the law on the subject

10

as of the time the law is enacted. *This will include all the amendments and modifications of the law subsequent to the time the reference statute was enacted.*" 156 F.3d at 1340 (quoting 2B Sutherland Statutory Construction § 51.08, at 192 (Norman J. Singer, 5th ed. 1992)) (inserted text omitted). We refer to this as the Reference Canon.

The *Atkinson* court declined to apply the Reference Canon, believing that the IOIA's "subject matter and the terms of the enactment in its total environment" took precedence. 156 F.3d at 1341 (quoting *United States v. United Mine Workers of Am.*, 330 U.S. 258, 314 (1947) (Frankfurter, J., concurring)). Specifically, the *Atkinson* court put great weight on one provision in the IOIA granting the President authority to "modify, condition, limit, and even revoke the . . . immunity of a designated organization," calling it the "explicit mechanism for monitoring the immunities of designated international organizations . . . ." *Id.* (citing 22 U.S.C. § 288).

That court reasoned that because the President is empowered by the IOIA to amend the immunity of international organizations, Congress intended that to be the sole manner by which a designated international organization's immunity could be altered after 1945. *Id.* It was thus unpersuaded that Congress intended the IOIA to incorporate subsequent changes to the immunity enjoyed by foreign governments. *See id.* (finding support for its conclusion in a Senate Report describing President's authority as "permitting the adjustment or limitation of the privileges in the event that any international organization should engage, for example, in activities of a commercial nature." S. Rep. No. 861, at 2 (1945) (internal alterations omitted)).

ESA points to nothing in the statutory language or legislative history that suggests that the IOIA provision delegating authority to the President to alter the immunity of international organizations precludes incorporation of any

11

subsequent change to the immunity of foreign sovereigns.[5] Indeed, ESA acknowledged at oral argument that the State Department has expressed support for OSSN's contention that the same restrictive immunity conferred on foreign governments in the FSIA should be applied to ESA. The State Department's view was reflected in a 1980 letter, where a State Department Legal Adviser wrote "The [FSIA] amended [U.S.] law by codifying a more restrictive theory of immunity subjecting foreign states to suit in U.S. courts . . . . By virtue of the FSIA, . . . *international organizations are now subject to the jurisdiction of our courts in respect of their commercial activities . . . .*" Letter from Roberts B. Owen, Legal Adviser, State Department, to Leroy D. Clark, General Counsel, Equal Employment Opportunity Commission (June 24, 1980) (emphasis added), *reprinted in* Marian L. Nash, *Contemporary Practice of the United States Relating to International Law*, 74 Am. J. Int'l L. 917, 917-18 (1980). The State Department's direct pronouncement of IOIA immunity is persuasive, particularly because the State Department played an important role in drafting the IOIA. *See* OSSN Br. at 47 n.6 (citing Letter from Harold D. Smith, Director, Bureau of the Budget, to James Francis Byrnes, Secretary of State, (Nov. 6, 1945), H.R. Rep. No. 1203 at 7).[6]

---

[5] The Senate Report cited by the *Atkinson* court merely purports to provide an example of the *kind* of change the President *could* make to the privileges enjoyed by an international organization. It is silent as to whether that immunity is "frozen" in time.

[6] We note in passing that a House Report explaining an amendment to the Foreign Corrupt Practices Act stated that "international organizations . . . generally have the same immunity as foreign governments, and the Foreign Sovereign Immunities Act (FSIA) . . . provides that foreign governments are not immune for actions taken in connection with their commercial activities." H.R. Rep. 105-802 (1998). This statement (not discussed in the *Atkinson* opinion) coincides with our view of the FSIA's effect on the immunity due international organizations.

The position of the United States is certainly worth careful consideration, if not deference. It is of significance that nearly half of the international organizations designated by the President as receiving protection under the IOIA came into existence after the FSIA was enacted in 1976. *See* 22 U.S.C. § 288 (West 2010) (Executive Orders) (listing the eighty organizations "entitled to enjoy the privileges, exemptions, and immunities conferred by the [IOIA]" and demonstrating that thirty-nine of these organizations were designated as such by executive order after 1976). In light of the "same immunity" language in the IOIA, it is unreasonable to assume that those international organizations that were established under the IOIA after foreign sovereign immunity had been altered by the FSIA would still be subject to that level of immunity enjoyed by foreign governments and international organizations in 1945.

If Congress wanted to tether international organization immunity to the law of foreign sovereign immunity as it existed at the time the IOIA was passed, it could have used language to expressly convey this intent. For example, Congress could have simply stated that international organizations would be entitled to the "same immunity as of the date of this Act." Or, it could have just specified the substantive scope of the immunity it was conferring. Because it did neither, we interpret the IOIA in light of the Reference Canon to mean that Congress intended that the immunity conferred by the IOIA would adapt with the law of foreign sovereign immunity.

ESA's contrary position leads to an anomalous result. If a foreign government, such as Germany, had contracted with OSSN, it would not be immune from suit because the FSIA provides that a foreign government involved in a commercial arrangement such as that in this case may be sued, as ESA acknowledged at oral argument. We find no compelling reason why a group of states acting through an international organization is entitled to broader immunity than its member states enjoy when acting alone. Indeed, such a policy may create an incentive for foreign governments to evade legal obligations by acting through international organizations. *See* Steven Herz, *International Organizations in U.S. Courts: Reconsidering the*

13

*Anachronism of Absolute Immunity*, 31 Suffolk Transnat'l L. Rev. 471, 521-22 (2008). For these reasons, we conclude that ESA is not entitled to immunity as it stood for foreign sovereigns in 1945.

As noted, the FSIA grants foreign governments immunity from the jurisdiction of United States courts, except when, inter alia, "the action is based upon a commercial activity carried on in the United States . . . ." 28 U.S.C. § 1605(a)(2). It is undisputed that the Agreements at issue here constituted such "commercial activity" and, because we construe the IOIA to incorporate the exceptions to immunity set forth in the FSIA, we will affirm the District Court's order denying ESA's motion to dismiss.

The District Court devoted only scant attention to the FSIA, following instead the rejection of that approach by the *Atkinson* court and by a district judge in the Eastern District of Pennsylvania, *Bro Tech Corp. v. European Bank for Reconstruction and Development*, No. 00-CV-02160-CG, 2000 WL 1751094, at *3 (E.D. Pa. Nov. 29, 2000). Instead, the District Court found for OSSN on the ground that it had waived the immunity the Court believed ESA was granted by the IOIA.

In so holding, the District Court relied on the "corresponding benefit" theory articulated by the court in *Mendaro v. World Bank*, 717 F.2d 610, 617 (D.C. Cir. 1983). The District Court reasoned that "[b]y providing proprietary software, tools, and information to ESA, OSS[N] provides commercial services to enable ESA to build and advance its organization. ESA must provide protection from unreasonable and arbitrary actions against outside parties in order to attract the outside parties to provide the materials and supplies needed to conduct business." App. at 21. The District Court then made explicit the "corresponding benefit," when it continued, "[o]utside parties would be hesitant to do business with ESA if there were no expectations of fair play." App. at 21.

The District Court tied its corresponding benefits theory directly to ESA's Convention which provides that "the Council

14

has the duty to waive this immunity in all cases where reliance upon it would impede the course of justice and it can be waived without prejudicing the interests of the Agency[.]" Convention, Annex I, Art. IV ¶ 1(a). The District Court, overlooking that the Convention places on the Council the responsibility for waiver on that ground, connected the substance of the waiver provision to the benefit ESA would derive. In holding that ESA had waived its immunity from OSSN's tort claims, the Court stated, "[t]he tort claims thus arise out of ESA's commercial transactions with the outside world. The Court therefore finds that ESA will benefit by waiving its immunity for both the contract and tort claims as it will enhance ESA's ability to participate in commercial transactions by promoting fair play in the market." App. at 22 (citation omitted).

The same is true of all commercial transactions. There is no inconsistency between the reasoning adopted by the District Court and the policy underlying the FSIA's withholding of immunity for commercial transactions engaged in by sovereign governments. It is worth noting that the decision in *Atkinson* did not concern a commercial transaction. In *Atkinson*, the claim was that of a divorced spouse who sought to satisfy outstanding state court judgments by garnishing the wages of her former husband, an employee of the Inter-American Development Bank. *See Atkinson*, 156 F.3d at 1336-37. In *Mendaro*, the claims against the World Bank were from a former employee alleging sexual harassment and discrimination. *See Mendaro*, 717 F.2d at 612. As the D.C. Circuit recognized in a later case, "[b]oth *Mendaro* and *Atkinson* stated that immunity from suits based on 'commercial transactions with the outside world' can hinder an organization's ability to operate in the marketplace." *Osseiran v. Int'l Fin. Corp.*, 552 F.3d 836, 840 (D.C. Cir. 2009) (citations omitted) (rejecting claim of immunity by defendant organization for suit by prospective investor claiming estoppel and breach of contract).

It appears therefore that the reasoning underlying the FSIA's exception for suits arising out of a government's commercial transactions from the broad immunity it otherwise accords such a government is equally applicable to international

organizations and is incorporated into the IOIA.

## IV.

We will therefore affirm the order of the District Court and remand this matter to the District Court for further proceedings consistent with this opinion.