**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 19-2248
_____

ROBERT DOWNEY,
                    Appellant

v.

PENNSYLVANIA DEPARTMENT OF CORRECTIONS;
SUPERINTENDENT WAYMART SCI;
PAUL DELROSSO, Deputy Superintendent for Centralized
Services;
DO DAVID TOMAZIC, Medical Director;
PA-C JESSICA ASHBY; OD KATHLEEN GAYNOR;
PA-C JENNIFER VILLIANO; PA-C TOM LYONS;
PA-C JANAN LOOMIS; WEXFORD HEALTH SOURCES
INC; CORRECT CARE SOLUTIONS
_____

Appeal from the United States District Court
for the Middle District of Pennsylvania
(D.C. No. 1-17-cv-00143)
Magistrate Judge: Honorable Karoline Mehalchick
_____

Argued on March 25, 2020
_____

Before: JORDAN, RESTREPO, and FUENTES, *Circuit Judges*.

(Opinion Filed:  August 03, 2020)

Clifford A. Rieders
Corey J. Mowrey [Argued]
Rieders, Travis, Humphrey, Waters & Dohrmann
161 West Third Street
Williamsport, PA 17701

    *Counsel for Appellant*

Josh Shapiro
Sean A. Kirkpatrick [Argued]
Office of Attorney General of Pennsylvania
Strawberry Square, 15th Floor
Harrisburg, PA 17120

    *Counsel for Appellees Pennsylvania Department of Corrections, Superintendent Waymart SCI, and Paul DelRosso*

Caitlin J. Goodrich
Kenneth D. Powell, Jr. [Argued]
Weber Gallagher
2000 Market Street, 13th Floor
Philadelphia, PA 19103

    *Counsel for Appellees Correct Care Solutions, David Tomazic, DO, Jessica Ashby, PA-C, Jennifer Villiano, PA-C, and Janan Loomis, PA-C*

---

OPINION OF THE COURT

---

RESTREPO, *Circuit Judge*.

Robert Downey has long struggled with glaucoma, which can lead to blindness if left uncontrolled. His condition worsened while he was imprisoned. As a result, doctors recommended that Downey have surgery expeditiously to save his eyesight. But nothing happened for almost a year—even though he repeatedly reached out to staff at the prison. Ultimately, surgery came too late and Downey is now blind.

Downey sued various defendants for monetary damages, among other relief. The District Court granted summary judgment against Downey, concluding that he failed to exhaust available administrative remedies as required by the Prison Litigation Reform Act ("PLRA"). We disagree and hold that his claims for monetary relief are not procedurally defaulted. However, we will affirm dismissal of Downey's claims against the Pennsylvania Department of Corrections and its officials on state sovereign immunity grounds, even though that defense was not raised before the District Court. Accordingly, we will reverse the District Court's order in part, affirm in part, and remand for further proceedings.

**I.**

Downey was incarcerated from September 24, 2013 to January 26, 2017. He served most of his prison term at the State Correctional Institution at Waymart, Pennsylvania ("SCI

3

Waymart"). When he first entered prison, he used eyedrops to treat glaucoma. On December 22, 2014, Dr. Richard Roth, an ophthalmologist at Eye Care Specialists, evaluated Downey. He thought Downey "may need surgical intervention" due to elevated eye pressure. App. 1113.

The following day, SCI Waymart's medical director, Dr. David Tomazic, evaluated Downey's condition. He concluded that Downey's severe glaucoma required urgent care and approved Dr. Roth's request for a follow-up consultation. The consultation took place on January 26, 2015. Dr. Roth ordered a surgical consultation with Dr. Robert Szulborski, another ophthalmologist at Eye Care Specialists, because the pressure in Downey's eyes remained extremely elevated. One day later, Dr. Tomazic approved the order for a surgical consultation because Downey's "severe bilateral glaucoma" required "urgent care." App. 1334.

It took nearly two months for the surgical consultation to take place. Dr. Szulborski saw Downey on March 18, 2015, concluding that Downey's right eye required an emergency procedure in one to two weeks to save his vision. Dr. Tomazic quickly approved the procedure. Despite Downey's well-documented rapidly deteriorating vision, however, no progress was made towards scheduling his surgery for the next nine months.

During an emergency consultation on December 2, 2015, Dr. Daniel Lutz, an ophthalmologist at Eye Care Specialists, recommended "surgical intervention to preserve remaining vision." App. 1091–95. Dr. Lutz explained at a deposition that Downey needed surgery "[a]s soon as humanly possible . . . [w]ithin a week or two." App. 1355. Downey

4

finally had surgery on his left eye on December 16, 2015 and his right eye on February 2, 2016. But the surgeries occurred too late to save his vision.

Surgery was delayed for nearly one year through no fault of Downey's. He attended numerous sick calls between April 15 and October 28, 2015 and filed inmate staff request forms on July 9 and November 29, 2015 to check on the status of the surgery and reiterate the symptoms he was experiencing. Downey may have also submitted additional request forms in May 2015 and on October 28, 2015.

Approximately one year later, Downey sought legal redress for the long delay. He did not undergo the formal grievance procedure specified in the Pennsylvania Department of Corrections' Inmate Handbook. Instead, he filed a complaint against the Pennsylvania Department of Corrections; Jack Sommers, the Superintendent of SCI Waymart; and Paul DelRosso, the Deputy Superintendent for Centralized Services at SCI Waymart (collectively, "DOC Defendants"). He also named certain medical personnel in the complaint, including Dr. Tomazic; PA-C Jessica Ashby; PA-C Jennifer Villiano; PA-C Janan Loomis; and Correct Care Solutions, which provides medical services at SCI Waymart (collectively, "Medical Defendants").[1]

One day later, which happens to be the day he was released from prison, Downey filed a first amended complaint ("FAC"). On June 1, 2017, he filed a second amended

---

[1] Over the course of the litigation, three Medical Defendants were dismissed by stipulation: Wexford Health Sources, Inc., OD Kathleen Gaynor, and PA-C Tom Lyons.

complaint ("SAC"). Downey claims that Medical Defendants and DOC Defendants (collectively, "Defendants") violated his Eighth Amendment rights pursuant to 42 U.S.C. §§ 1983 and 1988. He also claims violations of his rights under Pennsylvania state law.[2]

Medical Defendants filed a motion for summary judgment on December 27, 2018 and DOC Defendants did the same on January 28, 2019. The District Court granted Defendants' motions for summary judgment and declined to exercise supplemental jurisdiction over Downey's state law claims, holding that he failed to exhaust his administrative remedies because he did not satisfy the prison's grievance requirements.[3] *Downey v. Pa. Dep't of Corr.*, No. 1:17-CV-143, 2019 WL 2161692, at *6–7 (M.D. Pa. May 17, 2019). The Court noted that "[t]he exhaustion requirements of the PLRA continue to apply even if a plaintiff files an amended complaint after being released from prison." *Id.* at *4. In dicta, the District Court rejected the notion that Downey's condition was so

---

[2] Upon consent of the parties, this case was reassigned from Judge William W. Caldwell to Magistrate Judge Karoline Mehalchick pursuant to 28 U.S.C. § 636(c). We refer to the Magistrate Judge as the District Court throughout this opinion.

[3] The District Court also concluded that Downey's claims for injunctive and declaratory relief are moot because he is no longer incarcerated. Downey does not raise these claims in his briefs and thus waived challenging the District Court's ruling. *Kost v. Kozakiewicz*, 1 F.3d 176, 182 (3d Cir. 1993) (stating that an appellant's failure to raise and brief an issue results in "abandon[ment] and waiv[er] [of] that issue on appeal and it need not be addressed").

urgent that the grievance procedures were inapplicable to his claims. *Id.* at *6 n.2. Downey timely filed a notice of appeal.

## II.

The District Court had jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343. This Court has jurisdiction under 28 U.S.C. § 1291.

Federal Rule of Civil Procedure 56(a) empowers district courts to grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." We review the grant of summary judgment de novo and "draw all reasonable inferences in favor of the nonmoving party." *Hardy v. Shaikh*, 959 F.3d 578, 581 n.1 (3d Cir. 2020). We apply the same standard of review to the District Court's "determination of a failure to exhaust, and we accept the [District Court's] factual conclusions unless clearly erroneous." *Id.* at 584–85 (alteration in original) (internal quotation marks and citation omitted).

## III.

Downey challenges the District Court's dismissal of his claims for monetary damages. He argues that the District Court erred when it held that he failed to exhaust his administrative remedies under the PLRA. Alternatively, he posits that he was not required to exhaust because he was no longer incarcerated when he filed the SAC. Defendants dispute these points, and in addition, DOC Defendants raise state sovereign immunity as a defense for the first time.

7

We agree that the District Court erroneously concluded that Downey procedurally defaulted his monetary damages claims. But we also agree that state sovereign immunity prohibits Downey's suit as to DOC Defendants. Therefore, we will affirm in part, reverse in part, and remand to the District Court for further proceedings.

**A.**

Prisoners seeking to challenge the conditions of their confinement are subject to the PLRA, which mandates exhaustion of all available administrative remedies before bringing a lawsuit. 42 U.S.C. § 1997e(a). Exhaustion is a threshold requirement that district courts must consider. *Woodford v. Ngo*, 548 U.S. 81, 88 (2006); *Rinaldi v. United States*, 904 F.3d 257, 265 (3d Cir. 2018). Failure to exhaust is an affirmative defense that the defendant must plead and prove. *Jones v. Bock*, 549 U.S. 199, 216 (2007); *Rinaldi*, 904 F.3d at 268.

The PLRA requires proper exhaustion, meaning "complet[ing] the administrative review process in accordance with the applicable procedural rules." *Woodford*, 548 U.S. at 88. These procedural rules are supplied by the individual prisons. *Jones*, 549 U.S. at 218 ("[I]t is the prison's requirements, and not the PLRA, that define the boundaries of proper exhaustion."); *Spruill v. Gillis*, 372 F.3d 218, 222 (3d Cir. 2004) (determining whether "a prisoner has 'properly' exhausted a claim . . . is made by evaluating the prisoner's compliance with the prison's administrative regulations governing inmate grievances").

There is one exception to the mandatory exhaustion requirement: administrative remedies must be available to the prisoner. *Ross v. Blake*, 136 S. Ct. 1850, 1858 (2016) ("An inmate . . . must exhaust available remedies, but need not exhaust unavailable ones."). An administrative remedy is unavailable when it "operates as a simple dead end[,] . . . is so opaque that it becomes, practically speaking, incapable of use, or when prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." *Shifflett v. Korszniak*, 934 F.3d 356, 365 (3d Cir. 2019) (internal quotation marks omitted). Both the Supreme Court and this Court have rejected judge-made exceptions to the PLRA. *See, e.g., Ross*, 136 S. Ct. at 1856–58 (rejecting a "special circumstances" exception); *Nyhuis v. Reno*, 204 F.3d 65, 71 (3d Cir. 2000) (noting that the PLRA "completely precludes a futility exception").

The PLRA is intended to reduce the number of meritless inmate lawsuits challenging prison conditions. *See Woodford*, 548 U.S. at 93–94. Its stringent requirements aim to accomplish this by returning "control of the inmate grievance process to prison administrators," encouraging the "development of an administrative record, and perhaps settlements, within the inmate grievance process," and reducing "the burden on the federal courts by erecting barriers to frivolous prisoner lawsuits." *Spruill*, 372 F.3d at 230. Just as inmates must properly exhaust administrative remedies per the prison's grievance procedures, prison officials must strictly comply with their own policies. *Shifflett*, 934 F.3d at 367 ("[W]e hold that [the PLRA] requires strict compliance by prison officials with their own policies."). But "[w]hen an administrative process is susceptible [to] multiple reasonable

interpretations, . . . the inmate should err on the side of exhaustion." *Ross*, 136 S. Ct. at 1859.

**B.**

We now turn to the "policies of the prison in question" during Downey's incarceration. *Shifflett*, 934 F.3d at 364. The Pennsylvania Department of Corrections' 2013 Inmate Handbook sets forth the relevant procedures for inmates to file a grievance. Inmates are required to file a form, describing the incident, within fifteen working days to the Facility Grievance Coordinator, who generally must respond in fifteen working days.[4] If the prisoner receives an unfavorable response, he or she must then file an appeal to the Facility Manager within fifteen working days. If the grievance is again denied, the inmate has fifteen working days from the date of the Facility Manager's decision to appeal to the Secretary's Office of Inmate Grievances and Appeals for final review. The Secretary's Office must respond within thirty working days. In its entirety, the grievance process can take upwards of five months.

These general grievance procedures do not apply to every situation. Rather than going through the formal grievance process, the Inmate Handbook clarifies that inmates "should speak to the nearest staff person as soon as possible" when facing emergency situations. App. 337. The DC-ADM 804 policy effective May 1, 2015 adds that:

---

[4] Per the DC-ADM 804 Inmate Grievance System Policy effective May 1, 2015, working days are equivalent to business days and exclude state holidays.

10

> The Inmate Grievance System is intended to deal with a wide range of issues, procedures, or events that may be of concern to an inmate. It is not meant to address incidents of an urgent or emergency nature including allegations of sexual abuse. . . . When faced with an incident of an urgent or emergency nature, the inmate shall contact the nearest staff member for immediate assistance.[5]

App. 280. In other words, a prisoner dealing with an emergency, or an urgent situation, is not bound by the ordinary procedures specified in the grievance policy. Instead, he or she only needs to alert the closest staff person.

As we recognized in *Spruill*, our analysis of a prison's grievance policy is "essentially a matter of statutory construction." 372 F.3d at 232. We start with the policy's plain language and ordinary meaning. *See Idahoan Fresh v. Advantage Produce, Inc.*, 157 F.3d 197, 202 (3d Cir. 1998) ("[E]very exercise of statutory interpretation begins with [the] plain language. . . . Where the statutory language is plain and unambiguous, further inquiry is not required . . . ."). "We look to dictionary definitions to determine the ordinary meaning of a word." *United States v. Husmann*, 765 F.3d 169, 173 (3d Cir. 2014). The key phrase of the DC-ADM 804 policy is: "incidents of an urgent or emergency nature." App. 280. An emergency is "[a] sudden and serious event . . . that calls for

---

[5] Another version of the DC-ADM 804 policy was in effect from May 1, 2014 to April 30, 2015, but that version contains identical language regarding urgent or emergency situations.

11

immediate action" and "[a]n urgent need for relief or help." *Emergency*, Black's Law Dictionary (11th ed. 2019). Urgent means "calling for or demanding immediate attention." *Urgent*, Merriam-Webster Unabridged, https://unabridged.merriam-webster.com/unabridged/urgent (last visited July 3, 2020). An emergency or an urgent issue is one that requires immediate attention.

The record is replete with documents and testimony making clear that Downey's severe glaucoma was so urgent that it required immediate care to prevent permanent vision loss. Dr. Tomazic and Dr. Szulborski both characterized Downey's condition as "urgent" during their depositions and the latter thought Downey needed surgery in one to two weeks at the March 18, 2015 visit. Notes prepared after the December 2, 2015 consult emphasized that Downey needed an appointment "stat/now"[6] for surgery "to prevent blindness." App. 1587–89. Because surgery was not scheduled immediately as the doctors recommended, Downey is now blind in both eyes. In this urgent situation, all that the grievance system required Downey to do was to "contact the nearest staff member for immediate assistance," App. 280, which is what he did repeatedly.

Defendants raise several arguments in support of their position that the normal grievance procedures set forth in DC-ADM 804 still apply to Downey. They quibble with Downey's contention that his condition was urgent. Medical Defendants

---

[6] Janan Loomis, a physician assistant, explained during a deposition that the "stat/now" notation is used to trigger a "fast track way . . . if you're very concerned or if you have concerns." App. 2063.

go so far as limiting the exemption to individuals suffering conditions like a heart attack or stroke that demand immediate treatment. To bolster this argument, Defendants stress that this Court does not recognize a futility exception to the PLRA based on an emergency or an urgent circumstance.

Defendants' attempt to downplay the urgency of Downey's condition is unavailing. They conflate the prison and providers' obvious lack of urgency in providing medical treatment with a purported lack of urgency associated with Downey's rapidly deteriorating condition. Further, nothing in the Inmate Handbook or the DC-ADM 804 policy instructed Downey to file a formal grievance once the harm was complete, *i.e.*, once the urgency ceased because the delay in care already left him blind. To the contrary, according to the DC-ADM 804 policy, the typical grievance process does not apply to inmates faced with "incidents of an urgent or emergency nature." App. 280 (instructing prisoners to contact the closest staff member because "[t]he Inmate Grievance System . . . is not meant to address" those situations); *see also* App. 337 ("For an emergency, you should speak to the nearest staff person as soon as possible."). Though Defendants correctly assert that we do not recognize a futility exception to exhaustion, our analysis is drawn from the prison's policies "rather than from any free-standing federal law." *Shifflett*, 934 F.3d at 364. The Inmate Handbook and DC-ADM 804 policy exempted inmates facing an urgent situation from the typical grievance procedures, and Downey's condition clearly met that exemption.

Next, Defendants posit that Downey was required to grieve his claims to pursue monetary damages even if his condition was urgent. They point to language in DC-ADM 804

13

providing that an inmate who "desires compensation or other legal relief normally available from a court . . . must request the specific relief sought in his/her initial grievance." App. 281. Again, this provision is inapplicable to Downey because he was not required to submit a grievance due to the urgency of his situation. Neither the Inmate Handbook nor DC-ADM 804 suggests that a prisoner faced with an urgent situation must nonetheless file a grievance if seeking monetary damages. *Cf. Spruill*, 372 F.3d at 234 ("Nothing in the Grievance System Policy would have put [the plaintiff] on notice that he had to ask for monetary damages—or any particular relief at all.").

The grievance procedures are clear. Individuals dealing with urgent situations are not required to file a grievance. Downey's rapidly deteriorating vision as a result of severe glaucoma clearly constituted an urgent condition necessitating immediate care. We hold that, under the prison's own grievance policies, Downey was exempt from the typical grievance steps.

## C.

The District Court limited its consideration of the exemption to one footnote that is dicta. *See Downey*, 2019 WL 2161692, at *6 n.2 (stating that "it is not necessary to reach the issue of whether Downey's situation was 'urgent or emergent'"). Instead, the Court focused on Downey's failure to file a grievance while imprisoned, concluding that it was immaterial that Downey filed an amended complaint after he was released. *See id.* at *4 & n.1. Since then, our Court has addressed whether an amended or a supplemental complaint filed post-incarceration cures a former inmate's failure to exhaust administrative remedies while imprisoned. In *Garrett*

14

*v. Wexford Health*, 938 F.3d 69 (3d Cir. 2019), we answered in the affirmative, so long as the amended or supplemental complaint relates back to the initial complaint. Although Downey complied with his obligation under the prison's grievance procedures, we will briefly discuss *Garrett* to provide guidance to district courts on amended and supplemental complaints filed post-incarceration.

In *Garrett*, the plaintiff failed to exhaust available administrative remedies before filing a complaint. *Id.* at 76. After he was released from custody, he then filed an amended complaint. *Id.* 78–79. Although the initial complaint was defective because he did not satisfy the exhaustion requirement, we concluded that "[w]hen he filed the [third amended complaint], [he] was no longer a prisoner and therefore was not subject to the PLRA's administrative exhaustion requirement." *Id.* at 84. "[B]ecause it relates back to the original complaint, the [third amended complaint] cures the original filing defect."[7] *Id.* We vacated the dismissal of the plaintiff's claims for failure to exhaust and remanded to the district court. *Id.* at 96.

Medical Defendants raise several arguments to limit the import of *Garrett*: (1) all of Downey's claims arise from the same transaction or occurrence since he did not add any new claims, facts, or parties to his SAC; (2) none of Downey's

---

[7] Per Federal Rule of Civil Procedure 15(c)(1)(B), an amended complaint relates back when "the amendment asserts a claim or defense that arose out of the conduct, transaction, or occurrence set out—or attempted to be set out—in the original pleading."

15

claims were dismissed by the District Court; and (3) Downey did not initiate the grievance process while Garrett simply did not complete it.[8]

We consider each argument in turn. Medical Defendants' first argument is based on a misreading of *Garrett*. In that case, the plaintiff filed a third amended complaint after he was released from prison. *Garrett*, 938 F.3d at 78. This Court held that the PLRA's exhaustion requirement did not apply because his third amended complaint arose from the same transaction or occurrence as his initial complaint. *Id.* at 83–84. Similarly, in this case, Downey's SAC arises from the same transaction or occurrence as his initial complaint because

---

[8] In addition, DOC Defendants urge us to stay applying *Garrett* because the defendants in the case filed a petition for certiorari. The Supreme Court has since denied certiorari. *Wexford Health v. Garrett*, 140 S. Ct. 1611 (2020). Alternatively, Medical Defendants suggest that we adopt the Tenth Circuit's approach in *May v. Segovia*, 929 F.3d 1223 (10th Cir. 2019). The Tenth Circuit concluded that the applicability of the PLRA's exhaustion requirement is determined by referring to the plaintiff's status as a prisoner at the time of the initial complaint. *See id.* at 1228–29 ("The amended complaint, as the operative complaint, supersedes the original complaint's *allegations* but not its *timing*.") (emphasis in original). We decline to adopt the Tenth Circuit's approach because we are bound by *Garrett*. *See Reich v. D.M. Sabia Co.*, 90 F.3d 854, 858 (3d Cir. 1996) (noting that "a panel of this court is bound by, and lacks authority to overrule, a published decision of a prior panel").

he sets forth identical facts and nearly the same claims. *Garrett* squarely fits the facts presented in this case.

Next, neither *Garrett* nor Rule 15 requires that an amended complaint follow the dismissal of the previous complaint in order for the former to cure the latter's defects. Instead, *Garrett* reflects the liberal approach we take when considering amended complaints intended to cure defects in initial pleadings—as Downey's SAC was meant to do here. *See id.* at 82.

Lastly, Medical Defendants attempt to distinguish the plaintiff's failure to complete the grievance procedures in *Garrett* from Downey's failure to begin the process. That is a distinction without a difference. Rather than being limited to situations where plaintiffs file a grievance but do not fully exhaust their administrative remedies, *Garrett* took a broader approach focusing on completion. *See id.* at 84 (noting that the plaintiff's initial complaint was defective because he failed to "complet[e] the prison grievance process then in effect"). The fact that Downey did not file an initial grievance is irrelevant. All that matters is that he was no longer incarcerated when he filed the SAC and that it relates back to his initial complaint.

Both because he satisfies the urgency exemption and because he filed the SAC, which relates back to his original complaint, after he was released from custody, Downey was not subject to the Pennsylvania Department of Corrections' usual grievance procedures. Therefore, the District Court erred when it concluded that Downey's claims for damages are

procedurally defaulted for failure to exhaust his administrative remedies.

**D.**

DOC Defendants raise an additional issue. They claim that Eleventh Amendment state sovereign immunity bars Downey's claims against them. In response, Downey argues that sovereign immunity is not properly before this Court because DOC Defendants waived the defense. We agree with DOC Defendants and will affirm the District Court's order to the extent that it dismissed Downey's claims against them.[9]

Although DOC Defendants did not claim sovereign immunity in their summary judgment motion, "it has been well settled . . . that the Eleventh Amendment defense sufficiently partakes of the nature of a jurisdictional bar so that it need not be raised in the trial court." *Edelman v. Jordan*, 415 U.S. 651, 677–78 (1974). Further, we may affirm the judgment on any grounds supported by the record, including those not reached by the District Court. *Oss Nokalva, Inc. v. Eur. Space Agency*, 617 F.3d 756, 761 (3d Cir. 2010).

It is well established that lawsuits seeking retrospective relief by private persons against a state, state officials, and state entities are generally prohibited. *See, e.g., Regents of the Univ. of Cal. v. Doe*, 519 U.S. 425, 429 (1997) (stating that "[i]t has long been settled" that the Eleventh Amendment applies to "not only actions in which a State is actually named as the

---

[9] As such, we need not address DOC Defendants' argument that they are entitled to summary judgment as to Downey's Eighth Amendment claims.

18

defendant, but also certain actions against state agents and instrumentalities"); *P.R. Aqueduct & Sewer Auth. v. Metcalf & Eddy, Inc.*, 506 U.S. 139, 146 (1993) ("[Eleventh Amendment immunity] does not permit judgments against state officers declaring that they violated federal law in the past . . . .").

There are several important aspects of state sovereign immunity relevant to this appeal. First, Eleventh Amendment immunity bars actions for retroactive relief against state officers acting in their official capacity. *Kentucky v. Graham*, 473 U.S. 159, 169 (1985). To determine whether a plaintiff sued state officials in their official capacity, "we first look to the complaints and the course of proceedings." *Melo v. Hafer*, 912 F.2d 628, 635 (3d Cir. 1990), *aff'd*, 502 U.S. 21 (1991) (internal quotation marks omitted). Second, a state may waive the defense by consenting to be sued. *Koslow v. Pennsylvania*, 302 F.3d 161, 168 (3d Cir. 2002). Third, Congress may also abrogate state sovereign immunity pursuant to its power to enforce the Fourteenth Amendment. *Id.*

Downey seeks monetary damages against the Pennsylvania Department of Corrections and two DOC officials, Superintendent Jack Sommers and Deputy Superintendent Paul DelRosso. The Pennsylvania Department of Corrections is undoubtedly a state instrumentality and its officials are state agents. *See* 71 Pa. Stat. and Cons. Stat. Ann. § 61. Moreover, Sommers and DelRosso were not directly involved or even aware of the long delay in surgery until immediately before it was scheduled. They were named in the

complaint because of their positions—and were thus sued in their official capacity.[10]

The two exceptions to state sovereign immunity do not apply. Downey claims that the Commonwealth of Pennsylvania waived the defense pursuant to title 42, section 8522(b)(2) of the Pennsylvania Statutes and Consolidated Statutes, which waives sovereign immunity for damages caused by medical professional liability. But Downey overlooks a separate provision in Pennsylvania law making clear that any waivers to sovereign immunity do not apply to lawsuits in federal court. 42 Pa. Stat. and Cons. Stat. Ann. § 8521(b) ("Nothing contained in this subchapter shall be construed to waive the immunity of the Commonwealth from suit in Federal courts guaranteed by the Eleventh Amendment . . . ."). Pennsylvania has not waived its sovereign immunity defense in federal court.

Further, Congress did not abrogate Eleventh Amendment immunity via § 1983. *Quern v. Jordan*, 440 U.S. 332, 345 (1979) (concluding that the history and language of § 1983 indicate that Congress did not intend to make states liable

---

[10] At oral argument, Downey conceded that he is suing Sommers and DelRosso in their official capacity. He added that this is a *Monell* claim against DOC Defendants premised on the policies and procedures in place. That does not help Downey get around DOC Defendants' Eleventh Amendment defense because liability under *Monell* is limited to municipalities. *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690 n.54 (1978) ("Our holding today is, of course, limited to local government units which are not considered part of the State for Eleventh Amendment purposes.").

under the statute). Notably, the Supreme Court came to the opposite conclusion with respect to § 1988 in *Hutto v. Finney*, 437 U.S. 678, 693–694 (1978), however, this claim still fails because the Eleventh Amendment bars the § 1983 action. *Graham*, 473 U.S. at 165 ("[W]here a defendant has not been prevailed against, either because of legal immunity or on the merits, § 1988 does not authorize a fee award against that defendant."). Thus, state sovereign immunity prohibits Downey's claims against DOC Defendants.

In sum, we conclude that Downey's claims for monetary relief are not procedurally defaulted. We will reverse the District Court's grant of Medical Defendants' motion for summary judgment. But because DOC Defendants are immune from Downey's claims for retrospective relief under the Eleventh Amendment, we will affirm summary judgment in their favor.

## IV.

For the foregoing reasons, we will affirm in part and reverse in part the order of the District Court and remand the case for further proceedings consistent with this opinion.